IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**RECEIVED**

AUG 15 2018

CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL L. CRISPELL, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 18-1063 |
| | : | |
| JOHN E. WETZEL, Secretary, | : | |
| Pennsylvania Department of Corrections; | : | |
| SHIRLEY MOORE-SMEAL, Executive Deputy | : | |
| Secretary of the DOC; TREVOR WINGARD, | : | |
| Regional Deputy Secretary of the DOC; | : | JURY TRIAL DEMANDED |
| ROBERT GILMORE, Superintendent SCI | : | |
| Greene; MICHAEL ZAKEN, Deputy | : | |
| Superintendent SCI Greene; | : | |
| Defendants, | : | |
| | : | |

## COMPLAINT

### INTRODUCTION

1.    Daniel L. Crispell has been held in solitary confinement for over 27 years without any rational justification and without being afforded any meaningful process to address his confinement or to rectify the damage it has inflicted on him. His idle confinement in small cells in excess of 21 hours per day for nearly 28 years has harmed his mental and physical health, resulting in permanent damage to him.

2.    The extreme and cruel conditions of his confinement violate 42 U.S.C. § 1983, as well as the Eighth and Fourteenth Amendments to the United States Constitution.

3.    Mr. Crispell seeks injunctive, declaratory, and monetary relief to address these violations of his constitutional rights.

### JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

1

5.    This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2), because the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

## PARTIES

6.    Plaintiff Daniel Crispell is and was at all times relevant to this action a prisoner in the custody of the Pennsylvania Department of Corrections ("DOC"). He is currently incarcerated in solitary confinement at the State Correctional Institution ("SCI") Greene.

7.    Defendant John Wetzel is the Secretary of the DOC. His employment and mailing address is 1920 Technology Parkway, Mechanicsburg, PA 17050-8507. Defendant Wetzel is sued in his individual and official capacity.

8.    Defendant Shirley Moore-Smeal is the Executive Deputy Secretary of the DOC. Her employment and mailing address is 1920 Technology Parkway, Mechanicsburg, PA 17050-8507. Defendant Moore-Smeal is sued in her individual and official capacity.

9.    Defendant Trevor Wingard is the Deputy Secretary of the Western Region of the DOC. His employment and mailing address is 1920 Technology Parkway, Mechanicsburg, PA 17050-8507. Defendant Wingard is sued in his individual and official capacity.

10.    Defendant Robert Gilmore is the Superintendent of SCI Greene. His employment and mailing address is 175 Progress Drive, Waynesburg, PA 15370. Defendant Gilmore is sued in his individual and official capacity.

11.    Defendant Michael Zaken is the Deputy Superintendent for Facilities Management at SCI Greene. His employment and mailing address is 175 Progress Drive, Waynesburg, PA 15370. Defendant Zaken is sued in his individual and official capacity.

2

STATEMENT OF FACTS

A. Mr. Crispell's Conditions in Solitary Confinement

12.    All other allegations and facts contained in this complaint and its attachments are incorporated as if fully set forth herein.

13.    Mr. Crispell was sentenced to death on August 23, 1990. At the time he was just 19 years old.

14.    In September of 1990, Mr. Crispell was transfered from Clearfield County Jail to SCI Pittsburgh where he was immediately placed in the Restricted Housing Unit ("RHU")/Death row.

15.    In December of 1994, Mr. Crispell was transfered from the RHU at SCI Pittsburgh to the RHU at SCI Greene where he is currently still held.

16.    Mr. Crispell's cell is no larger than 7 feet by 14 feet, smaller than a typical parking space. Most of that space is consumed by a steel bed with a thin plastic covered mattress, sink, toilet, desk, stool, and cabinet, all steel, leaving very little room to walk or move around. The institution keeps the lights on outside his cell door as well as the large bright lights outside his cell window that also stay on all night long, shining into his cell. The institution keeps the light on in his cell 24 hours a day and Mr. Crispell has no ability to shut it off while officers shine flashlights in his face every 30 minutes during their nightly rounds. The sound of steel doors clanging open and shut persists day and night, disturbing what little sleep Mr. Crispell gets.

17.    The cells on SCI Greene's death row manifest the height of indignity. All of Mr. Crispell's movements, including his use of the toilet and personal hygiene, are on full display for the guards like an animal in a zoo.

18.    The DOC has held Mr. Crispell in solitary confinement starting in 1990 for well over half his life.

19.    For almost 28 years, the DOC has forced Mr. Crispell to spend more than

3

21 hours a day idle and alone in his cell, with little or no human interaction or external stimulation other than that provided by the guards who watch those on the row and ensure their isolation. For 27 years he has eaten every meal that he has had alone in his cell. The DOC only changed this practice slightly recently(2018) to now allow Mr. Crispell to eat one meal a day with other inmates on the same pod, same tier.

20.   The noise on the block is so bad that prisoners can only hear each other if they yell out the side of their cell door, and yelling is prohibited. If they violate these rules to talk to each other, they risk a misconduct charge and are punished with time in disciplinary custody.

21.   Until recently, on those rare occasions in which he is permitted to leave his cell, Mr. Crispell was forced to undergo a humiliating mandatory strip search. Any time he was outside of his cell, Mr. Crispell was either cuffed and secured to a belt around his waist or cuffed behind his back and tethered to a dog leash that is controlled by one of the two guards escorting him. The DOC only changed this practice in the early part of this year(2018), Mr. Crispell is still cuffed and secured to a belt around his waist every time he leaves the RHU.

22.   All visits - personal and legal - happen in a booth with Mr. Crispell on one side of a glass, steel and concrete partition and the visitor on the other side. They speak to each other through narrow steel screens along the sides of the booth.

23.   Over the course of 27 years, Mr. Crispell has not been allowed to hug, or even so much as shake the hand of his family or other visitors. Aside from incidental contact inside the prison, Mr. Crispell had not had meaningful human contact for over 20 years.

24.   As a death row inmate, Mr. Crispell is restricted to three 15-minute phone calls per week and unlimited legal calls with counsel but those legal calls

must be scheduled in advance by the attorney in writing. At various times, officers arbitrarily invoke a rule that legal calls count against the three calls per week limit, forcing Mr. Crispell to make the Hobson's choice of speaking with his attorneys about his litigation or talking with his family.

25.   Death row inmates are also restricted to their access to the law library. They must sign up for a limited time in advance and access is dependent on the availability of a time slot and guards to escort them to and from the law library.

26.   For the entire time that he has been in solitary confinement, Mr. Crispell has been permitted, at most, two hours, Monday through Friday for "exercise" in an empty, fully enclosed cage with a concrete floor that is no bigger than a dog kennel run. Access is dependent on the guards and their assessment of acceptable weather conditions. The DOC changed this practice slightly in the earlier part of 2018 and now allow two hours, 7 days a week and have created bigger cages but he is still restricted as to who he can go into a cage with.

27.   Books and other materials are limited on the basis of the size of his cell and DOC policy. Over the course of 27 years, Mr. Crispell has repeatedly and consistently been denied opportunities to participate in educational courses, vocational training, organized activities, counseling programs, or other programs that are readily available to inmates in general population, some of which are mandatory for all inmates except death row inmates. Even people housed in the RHU for disciplinary infractions are afforded the same opportunities Mr. Crispell has been denied, solely based on his capital case status.

28.   Mr. Crispell like all prisoners in the RHU, is forced to move to a different cell every 90 days, depriving him of any sense of stability in his immediate surroundings.

29.  When an inmate creates a security concern, the entire RHU (but not general population ) is shut down. Mr. Crispell cannot make phone calls, have visits, see a doctor, go to the yard, take a shower, or go to the law library. These lockdowns in the RHU due to inmate violations have occurred about one per month on average over the last twentysome years.

30.  In stark contrast, the DOC provides people in general population many opportunities for conversation, exercise, programs, and self help. They have indoor recreation space, outdoor recreation multiple times a day, indoor and outdoor exercise equipment, and job opportunities with advancement to higher skill levels and higher pay. The DOC offers dozens of programs, classes and treatment services, as well as a law library with more resources. General population inmates eat together in a cafeteria, have contact visits, three 15-minute phone calls per day, and private conversations with medical and therapeutic staff. They are assigned to their cell indefinitely, move about the prison without physical restraints and are only strip searched in relation to a security threat and for visits.

31.  In over 27 years Mr. Crispell has had only three disciplinary infractions, none of which even remotely involved violence or assaultive behavior. Mr. Crispell has not had a disciplinary infraction in 20 years.

32.  Over the course of the nearly 28 years since his commitment to solitary confinement, Mr. Crispell has witnessed the toll of the conditions on other inmates.

33.  Since Mr. Crispell has been in solitary confinement numerous inmates on death row have died in their cell or in medical, some have been suicides. Many unsuccessful suicide attempts by death row inmates have also occurred.

6

B.    **The Absence of any Meaningful Review of Mr. Crispell's Solitary Confinement Conditions.**

34.    All other allegations and facts contained in this complaint and its attachments are incorporated as if fully set forth herein.

35.    On November 22, 1982, the DOC Commissioner issued an order removing all capital case prisoners from general population and locking them in the RHU to be held in permanent solitary confinement.

36.    RHU prisoners are not permitted to re-enter the general population without the express authorization of the Secretary of the DOC.

37.    The DOC provides no meaningful review of Mr. Crispell's conditions of confinement. Instead, every 90 days, members of the Program Review Committee ("PRC") hold perfunctory hearings to "review" his conditions of confinement. To attend, Mr. Crispell must undergo a search, walk cuffed and secured to a belt around his waist to a small room where he remains cuffed and belted throughout the proceedings.

38.    The review involves nothing more than the committee members (which generally consists of the death row unit manager, the death row counselor, the death row psychologist, and a member of the prison Activities Department) asking Mr. Crispell what he wanted to talk to them about. The inquiry is designed solely to address administrative issues that Mr. Crispell may be having in solitary confinement, not the appropriateness or justification for his continued solitary confinement despite his model prison behavior.

39.    Mr. Crispell's repeated requests to the PRC for services and self-improvement programs have consistently been met with the same rote response "In view of the Department of Corrections' policy, as it relates to capital cases, it was recommended that Mr. Crispell be continued in capital case custody. Next review will be in three months".

7

40.  Defendants do not afford Mr. Crispell, or any other qualified person or medical professional, any meaningful opportunity to evaluate the appropriateness of his perpetual solitary confinement or his desire and ability to re-enter the general prison population.

41.  As noted, Mr. Crispell has had three rule infractions in almost 28 years and none of them involved violent or aggressive behavior. Also as noted Mr. Crispell has not had a rule infraction in the last 20 years.

42.  DOC policy does not provide a capital case prisoner any opportunity to challenge his solitary confinement by providing information or input to the decision-maker. The 90 day PRC "review" is the only opportunity that Mr. Crispell is afforded to speak regarding his solitary confinement. Mr. Crispell has consistently requested removal from solitary confinement after the Common Pleas Court vacated his death sentence in January of 2016.

43.  Upon information and belief, nothing that Mr. Crispell has said at PRC hearings is transmitted to the sole decision-maker on his solitary confinement status, Defendant Wetzel.

44.  Since September 1990, Mr. Crispell has not been provided with any written or other substantive explanation of the basis for the decision to keep him in solitary confinement, other than his sentence.

45.  Although prison officials at SCI Greene have told Mr. Crispell that he will remain in solitary confinement until his DC-16E Sentence Status Summary is updated to show his vacated death sentence, the sole decision-maker in the matter, Defendant Wetzel, has never communicated any reason to Mr. Crispell as to why he remains in solitary confinement.

46.  On February 9, 2017, the Third Circuit issued its opinion in *Williams v. Secretary, et al.,* 848 F.3d 549 (3d Cir. 2017), holding that due process limits the DOC's ability to house inmates on death row without meaningful review

8

of placement once they have been granted relief.

47.   On February 17, 2017, during Mr. Crispell's 90 day review he asked  to be moved to general population based on his vacated sentence and the Third Circuit's holding in *Williams v. PA Department of Corrections, et al.,*  848 F.3d 549 (3d Cir. 2017). Mr. Crispell even provided the PRC with a copy of the Court's order vacating his death sentence during the 90 day review. Mr. Crispell was told by the PRC that DOC policy had not changed and so he would remain in solitary confinement on death row.

48.   On February 22, 2017, Mr. Crispell filed a grievance challenging his continued confinement in solitary confinement and received a Notice of Staff Extention (for 10 days) dated March 3, 2017.

49.   On March 24, 2017, Mr. Crispell received the Inital Review Response to his grievance, denying his grievance, stating that "Central Office is aware of the court decision and is working on the implementation. There has been no change in the current policy at this time therefore you will remain housed in capital case status until directed otherwise".

50.   The response was written and signed by the grievance officer assigned to the grievance, Mr. Patrick Felice. Mr. Felice is the unit manager for death row as well as the head of the 90 day PRC that Mr. Crispell filed the grievance against.

51.   On March 26, 2017, Mr. Crispell filed his Appeal To Facility Manager, Robert Gilmore, raising a conflict of interest claim against Mr. Felice and restating his original grievance claims.

52.   On April 21, 2017, Mr. Crispell received notification that his grievance was remanded back to the grievance officer for a "revised response".

53.   On April 28, 2017, Mr. Crispell received the revised response to his grievance. The only difference between the two responses was the date and the

9

name of the grievance officer, Major of Unit Management, Dan Caro.

54.   On April 28, 2017, Mr. Crispell filed a second Appeal To Facility Manager, Robert Gilmore. In it he once again restated all of his claims from his original grievance and asked that his grievance be granted and he be released from solitary confinement to general population.

55.   On May 24, 2017, Mr. Crispell submitted an "INMATE'S REQUEST TO STAFF MEMBER" to Superintendent Gilmore asking him to send a response to his grievance appeal as it was overdue. On May 26, 2017, Superintendent Gilmore's office responded, stating that once a response was completed it would be forwarded to him.

56.   On June 1, 2017, Mr. Crispell was brought in to meet with the PRC (Unit Manager Felice, Deputy Superintendent Zaken, Major of the Guard-Security Wallace Leggett, and death row Counselor Ms. Humbert) and told that he was being released to general population because his death sentence had been overturned.

57.   On June 2, 2017, Mr. Crispell, was released to general population.

58.   On June 7, 2018, Mr. Crispell received the Facility Manager's Appeal Response with the nightly mail. In Superintendent Gilmore's response he states that, the response provided by the grievance officer is upheld. Central Office was aware of the court decision and was working on an implementation. I find that you are now housed in general population, therefore rendering this a moot issue.

59.   In light of the fact that Mr. Crispell was now housed in general population, Mr. Crispell chose not to pursue the grievance further as his main grievance was that he was being held in solitary confinement illegally.

60.   In general population Mr. Crispell adapted well to his new enviroment.

61.   Mr. Crispell was no longer handcuff or restrained in any manner or strip searched except during security situations or before visits.

62.   The light in Mr. Crispell's cell was only on when he wanted it on and

the guards only did rounds once an hour. During those rounds as long as Mr. Crispell was visible the guard did not shine his flashlight into the cell, allowing Mr. Crispell to finally get some much needed sleep.

63. Mr. Crispell was able to go to the large exercise yard multiple times a day and when the weather didn't permit yard Mr. Crispell was able to be out of his cell for block out which allowed him to socialize with other inmates.

64. While in the outside yard, Mr. Crispell was able to participate in various activities including playing basketball, handball, softball, football, running on the track, and lifting weights on the provided weight machines. Mr. Crispell took full advantage of these activities and greatly improved his overall health.

65. Mr. Crispell was also able to go to the gym several times per week to use the weight room, the cardio exercise room and participate in yoga classes. All of which Mr. Crispell did.

66. Mr. Crispell had a job cleaning the cellblock that he was housed on five days a week as well as collecting and delivering the cellblock laundry and passing it back out when it was cleaned.

67. Mr. Crispell was also on the waiting list to be hired for a more skilled and better paying job when one was available.

68. Mr. Crispell was able to participate in community religious services on a bi-weekly basis, which he did as well.

69. Mr. Crispell was able to participate in group programming, which he also did. Mr. Crispell was taking Alcohol And Other Drugs ( A.O.D. ) class and was scheduled to take violence prevention class when a spot became available.

70. Mr. Crispell was able to go directly to the medical department with his medical problems and was able to talk to the medical personal and be examined in private.

71.   While in general population, Mr. Crispell was able to shower daily instead of only 3 times a week like he was only permitted to in the RHU.

72.   While in general population, Mr. Crispell was able to go to the library/law library at least twice per week. The general population law library has many more resources than the RHU law library as well as on site legal aid when needed. Mr. Crispell used the law library and its resources frequently while in general population.

73.   While in general population, Mr. Crispell went to the communal dining hall to eat all of his meals along with every other general population inmate, he wasn't forced to eat all of his meals in his cell alone. He was able to choose what type of tray he wanted to get, there and then, unlike the RHU where an inmate must sign up for an entire month of alternative meals in advance and once signed up for those meals he cannot switch back to regular meals until the month is over. The food in the general population dining hall is also served hot, whereas in the RHU the meals are sent from the main kitchen to the RHU kitchen to be put onto trays and loaded onto a cart and delivered to the individual RHU blocks. From there the trays must be unloaded from the cart and then taken around to each individual cell. By the time a RHU inmate receives his tray the food is almost always cold. If the inmate doesn't eat the cold meal then he has to without.

74.   While in general population, Mr. Crispell was able to receive contact visits with his family, friends and lawyers. This was the first physical contact that Mr. Crispell had with anyone other than prison staff or other inmates in almost 30 years. Mr. Crispell received contact visits every month with family and friends where he was able to hug and have physical contact with his family and friends. During a visit with his parents Mr. Crispell was able to hug and hold the hand of his mother and father for the first time in almost 30 years. He was

12

also able to sit at a table with his visitors and share food with them.

75.   While in general population, Mr. Crispell was allowed to make up to 3 phone calls per day as opposed to in the RHU where he was only allowed to make 3 calls per week.

76.   While in general population, Mr. Crispell was able to join an inmate organization where he had a say in the events of the Activities Program ( A.C.E. ). Mr. Crispell joined as soon as he was able to.

77.   Where Mr. Crispell was housed in general population it was quiet at night and usually during the day as well. There was no yelling out the side of the doors because the inmates were able to talk to each other face to face when they were out of their cells during the day.

78.   While in general population, Mr. Crispell was able to participate in the prison " In Cell Music Program ". He was able to start working on a long held wish of his to learn to play a musical instrument. Mr. Crispell bought an electronic keyboard and books that teach how to play the piano. Mr. Crispell had only had his keyboard for a few weeks when he was removed from general population and placed back in solitary confinement where inmates are not permitted to participate in the In Cell Music Program even though they are the inmates who would benefit the most from such a program. Once back in the RHU, Mr. Crispell was told that he couldn't keep his keyboard in his cell or even have access to it. Mr. Crispell was told by RHU staff that although there was not anything in the DOC policy that said he couldn't have his keyboard in his cell there also was not a DOC policy that said he could and therefore he had three choices. He could either put his keyboard in the property storage room until he was released back into general population, ship his keyboard home at his own expense or have his keyboard destroyed by the prison.

79.   While in general population, Mr. Crispell had no rule infractions of

13

any kind and was a model inmate.

80.  In the early evening of November 8, 2017, with no warning whatsoever, a Lieutenant, a Sergeant and 2 officers came to Mr. Crispell's cell door and told him to back up to his cell door and put his hands through the cell door slot so that he could be cuffed. When Mr. Crispell asked what was going on, the Lieutenant told him that he was being taken back to death row. When Mr. Crispell told the Lieutenant that there must be some mistake because he no longer had an active death sentence, the Lieutenant replied that there had been a mistake and that Mr. Crispell should never have be released to general population in the first place and that he was just following the orders that he was given and if he had any other questions he should ask the death row Unit Manager when he got back to the row.

81.  Mr. Crispell was then handcuffed behind his back and made to back out of his cell where his arms were grabbed by 2 officers while he was patted down. He was then marched out of the cellblock with the 2 officers still gripping his arms tightly, followed by the sergeant and Lieutenant. Mr. Crispell was taken to F - block ( the hole ) where he was locked in a cage and subjected once again to a humiliating strip searched and then given a RHU jumpsuit to wear, all of this while being videotaped by another officer. After the strip search, Mr. Crispell was locked in a different cage to wait to be taken back to the death row block. When the death row block officers came to get him, Mr. Crispell was once again handcuffed behind his back and then escorted by a sergeant and an officer back to death row.

82.  Once back on the death row block, Mr. Crispell was put into an empty cell with nothing but clothing he was wearing, a bare mattress and a role of toilet paper. He wasn't provided with a pillow, sheets,a blanket, pillow case or even a towel. All of Mr. Crispell's property was left in the general population

cell that he had been housed in.

83.  Mr. Crispell was given most of his property later that night after it was packed up by a general population inmate, and then inventoried once it was brought to the death row solitary confinement block.

84.  All of Mr. Crispell's tobacco and tobacco products were confiscated and thrown away even though he asked that they be held until he could file a grievance on the items being confiscated. Tobacco and tobacco products are not allowed for inmates in solitary confinement, so on top of everything else that was happening to him, Mr. Crispell had to go through nicotine withdrawal with nothing to mute the effects. Mr. Crispell had been smoking for the five months that he was in general population and was addictted.

85.  Mr. Crispell spoke briefly with Patrick Felice, the unit manager for death row about 30 minutes after he was put into the cell on death row. Through the side of the cell door Mr. Crispell asked why he was back on death row when he no longer had an active death sentence. Mr. Felice told Mr. Crispell that because his vacated sentence was being appealed his habeas relief had been stayed and his death sentence had been reinstated and made active.

86.  On November 9, 2017, Mr. Crispell was able to contact his attorney by phone to ask him what was going on. Mr. Crispell's attorney was as surprised as he by the DOC's actions and told Mr. Crispell he would look into it.

87.  On November 14, 2017, Mr. Crispell met with the PRC ( Mr. Felice, Mr. Bowden, Ms. Humbert, and Mr. McCombie ). Mr. Crispell was once again searched, handcuffed and secured with a belt around his waist, before he was brought to the PRC. Mr. Crispell asked Mr. Felice if he was scheduled to see the real PRC and was told by Mr. Felice that he was on the list to see them later that same day. Mr. Crispell told Mr. Felice that since the PRC that he was talking to at the moment had no additional information on his current situation, he would wait to

talk to the real PRC.

88.   On November 14, 2017, Mr. Crispell, after once again being searched, handcuffed and secured to a belt around his waist, was brought to the actual PRC (Deputy Zaken, Major Leggett, Mr. Smith and Mr. Felice). Mr. Crispell immediately asked to be returned to general population because he no longer had an active death sentence and so didn't belong housed on death row. Deputy Zaken told Mr. Crispell that Ms. Denise L. Wood, from Central Office had sent the order to bring him back to death row because his vacated sentence was being appealed. Mr. Crispell, informed the PRC that his vacated sentence was already being appealed long before he had even been released to general population in June and that the Third Circuit's holding in *Williams v. PA Department of Corrections*,   held   that even if his vacated sentence was being appealed, as long as he didn't have an active death sentence he shouldn't be housed in solitary confinement on death row. Deputy Zaken told Mr. Crispell that until Central Office ordered otherwise, he would continue to be housed on death row and that there was not anything Deputy Zaken could do about it.

89.   On November 14, 2017, Mr. Crispell filed a grievance on his being illegally housed in solitary confinement on death row.

90.   On November 15, 2017, Mr. Crispell filed an appeal of the finding of the November 14, 2017, PRC Review to Superintendent Robert Gilmore.

91.   In early December 2017, Mr. Crispell was finally given a copy of his new DC16E - Sentence Status Summary. That summary, dated December 7, 2017, states that his sentence of execution had been added back and that his habeas relief had been stayed by a pending appeal. On that sentence status summary it also states that Mr. Crispell's death sentence was "Active" and lists  his Controlling Maximum/Minimum Date as "Execution".

92.   On December 20, 2017, Mr. Crispell received the "Initial Review

Response" to his grievance (#707786), denying his grievance. In that response, the grievance officer assigned to Mr. Crispell's grievance, Unit Manager, Patrick Felice, states that the institution received information from Central Office that Mr. Crispell's Habeas Relief had been stayed by a pending appeal and he was to be moved back to the capital unit until his status was determined and that Central Office had been working to resolve his status. Mr. Felice, also states that there had been a decision and the execution sentence had been reinstated, therefore he would remain housed in capital case until directed otherwise.

93.  On December 22, 2017, Mr. Crispell received Superintendent Gilmore's response to Mr. Crispell's appeal of the findings of his November 14, 2017, PRC Review, denying the appeal. In Superintendent Gilmore's response, dated December 12, 2017, he states that his review indicates Mr. Crispell was appropriately returned to the capital case unit under Administrative Custody due to his execution sentence being reinstated and that he would not alter the decision of the Program Review Committee.

94.  On December 26, 2017, Mr. Crispell submitted his Final Appeal of the November 14, 2017 PRC Review decision, to the Chief Hearing Examiner, located at Central Office, PA Department of Corrections, 1920 Technology Parkway, Mecanicsburg, PA 17050, once again asking for the November 14, 2017 PRC Review decision to be reversed and that he be released back to general population immediately. Mr. Crispell never received any response to his appeal from Central Office.

95.  On December 26, 2017, Mr. Crispell submitted an "Appeal To Facility Manager" for his grievance (#707786). In his appeal, Mr. Crispell once again asked to be released to general population because he no longer had an active death sentence. Mr. Crispell also asked for damages to be awarded to him for the severe mental and emotional distress due to the DOC illegally housing him in

solitary confinement on death row, and telling him that his death sentence had been reinstated and was "Active".

96. On January 23, 2018, after 2 months of repeated requests to be seen by a prison psychiatrist because of the severe mental and emotional distress he was experiencing, and only after Mr. Crispell filed a grievance on the matter, Mr. Crispell was finally evaluated by a prison psychiatrist, who immediately prescribed "Anti-Depression" and "Anti-Anxiety" medications for Mr. Crispell to treat his depression, anxiety attacks, night terrors, sleep problems, restlessness, and low energy.

97. On January 29, 2018, Mr. Crispell received the "Facility Manager's Appeal Response". In that response, Superintendent Gilmore states, "The response provided by the grievance officer is upheld. Mr. Crispell, while your concerns are understood, you are currently housed in accordance with the current execution sentence imposed on you by the courts. You will remain housed in the Capital Case Unit until directed otherwise". Mr. Crispell's appeal was denied.

98. On January 30, 2018, Mr. Crispell submitted his "Inmate Appeal to Final Review" to the, Secretary's Office of Inmate Grievances and Appeals, 1920 Technology Parkway, Mechanicsburg, PA 17050, once again asking that his grievance be granted and that he be immediately released to general population and awarded damages.

99. On February 21, 2018, The United States District Court, For The Eastern District Of Pennsylvania, in *Hall v. Wetzel*, et. al., NO. 17-CV-4738, granted Mr. Hall's Motion for a Preliminary Injuction and ENJOINED the defendants from continuing to house Plaintiff Darrick Hall in the solitary conditions of confinement in the Capital Case/Restricted Housing Unit for the sole reason that he faced a capital sentence and/or pursuant to the provisions of 61 Pa. C.S.A. § 4303 and any and all implementing regulations. The court Further Ordered that

Defendants shall, within seven days of the entry date of this order, provide Plaintiff with a hearing providing meaningful review of his appropriate placement in the prison, taking into account such factors as the safety of other inmates and staff, Plaintiff's continued public or institutional risk, Plaintiff's disciplinary history, Plaintiff's mental health history and current mental health status, and his physical health history and present health status, among other relevant considerations. In the event that Mr. Hall is found to satisfy the conditions warranting placement in the General Population, Defendants are DIRECTED to begin to take immediate steps to facilitate his safe and orderly transition to an appropriate placement in the general population.

100. On March 8, 2018, Mr. Crispell submitted an Inmate's Request To Staff Member, to Deputy Superintendent Zaken, alerting him to the *Hall v. Wetzel*, decision and once again asked that he be immediately released to general population.

101. On March 12, 2018, Mr. Crispell received Deputy Zaken's response to his March 8, 2018, request to staff. Deputy Zaken states in his response that as he explained to Mr. Crispell at his cell, his housing is at the discretion of Central Office Records and Legal Counsel and that if they received direction to release Mr. Crispell to general population, they would.

102. On March 8, 2018, Mr. Crispell submitted an Inmate's Request To Staff Member, to Superintendent Gilmore, alerting him to the Court's decision in *Hall v. Wetzel*, and again asking that he be immediately released to general population.

103. On March 12, 2018, Mr. Crispell received Superintendent Gilmore's response to his March 8, 2018, request to staff. Superintendent Gilmore states in his response that, "once again he will ask Mrs. Rebekah Cristini to respond to your request".

104. On March 16, 2018, Mr. Crispell received Mrs. Cristini's response to his March 8, 2018, request to Superintendent Gilmore. In her response, Mrs. Cristini states that, "Per the direction of Central Office and Chief Counsel, the execution sentence at indictment CP 62:1990 is to remain because your habeas relief has been stayed by a pending appeal. The institution is housing you in accordance with the direction that was provided".

105. On March 16, 2018, Mr. Crispell received a GRIEVANCE REFERRAL, Notice to Inmate, from Dorina Varner, Chief Grievance Officer, Secretary's Office of Inmate Grievance and Appeals. The Notice, dated March 8, 2018, states, "this Office has reviewed the documents submitted; including your initial grievance, the grievance officer's response, your appeal to the facility manager, the facility manager's response, and the issues you raised to final review. Upon completion of this review, it is the determination of this Office to solicit input from an appropriate Central Office Bureau relative to the issue(s) raised in your grievance. Therefore, please be advised that the final review decision will be delayed pending review by the office to which it has been referred. Upon completion of this review, however, a determination will be made and you will be provided with a final appeal decision in writing".

106. On April 25, 2018, Mr. Crispell sent a letter to the Secretary's Office of Inmate Grievances and Appeals, Dorina Varner: Chief Grievance Officer, PA Department of Corrections, 1920 Technology Parkway, Mechanicsburg, PA 17050, in which Mr. Crispell asks why he has not received the Final Review Decision of his greivance (#707786) as it was long overdue according to DOC policy, DC-ADM 804. Mr. Crispell never received an answer to that letter.

107. On May 16, 2018, Mr. Crispell received the Final Review Decision of his grievance (#707786), from the Secretary's Office of Grievances and Appeals, dated May 9, 2018. Which states, "Staff in the Corrections Sentence Computation Unit

20

has reviewed your records and found that although your sentence was vacated there is a Supreme Court appeal staying that relief. It has been the DOC's practice to continue housing inmates in that particular type of situation in the capital case unit until the appeal is resolved. The only inmates being removed from the capital case unit pending resentence are those cases on which all appeals have been exhausted. The first time you were removed was an error as there is still a pending appeal in your case. Apologies are extended to you for this error. The DOC was not waging psychological warfare against you, attempting to play mind game tactics, etc. Therefore, this office upholds the responses provided to you and your requested relief is denied."

C.    The Impact of Long-Term Solitary Confinement Depriving Mr. Crispell of Basic Human Needs.

108. All other allegations and facts contained in this complaint and its attachments are incorporated as if fully set forth herein.

109. For almost 27 years, Mr. Crispell has been deprived of basic and fundamental human needs, included but not limited to: mental health and environmental stimulation; social interaction; sleep; a reasonable opportunity to exercise; and dignity.

110. Subjecting even a healthy person to solitary confinement, without environmental or social stimulation causes significant psychological harm. Grassian, *Psychiatric Effects of Solitary Confinement,* 22 Wash. U.J.L. & Pol'y 325 (2006). Sensory deprivation causes individuals to experience a cluster of organic features, including: "hyperresponsivity to external stimuli;" "perceptual distortions, illusions and hallucinations;" "difficulties with thinking, concentration, and memory;" "intrusive obsessional thoughts;" "overt paranoia;" and "problems with impulse control." *Id.* at 336.

111. According to DOC Policy 13.8.1, Section 1 (E)(4)(b), referring to

21

Policy 6.5.1, the DOC requires that a correctional officer who has worked in a SL5 Unit (like the RHU) longer than 12 months must be evaluated by a licensed psychologist to determine if he or she is still able to continue working in that unit. If the conditions are so severe that the DOC has mandated yearly psychological evaluations for the guards, who can go home at night and escape the onerous conditions of perpetual solitary confinement, it is on-notice of the adverse impact on those, like Mr. Crispell, who are not able to leave.

112. For the past 27 years, Mr. Crispell has struggled to maintain relationships with his grandparents, mother, father, and his three siblings while in custody. All of Mr. Crispell's five nieces and five nephews have been born since he has been incarcerated. He has only met the oldest nephew in person, once, more than 20 years ago. Almost three decades in perpetual solitary confinement, however, have taken a severe toll on these connections. No matter how motivated, the family's waning energy to sustain lasting bonds through inch-thick glass during occasional visits continues to diminish Mr. Crispell's relationships and has significantly eroded his mental and emotional stability. The deaths of all four of his grandparents, an aunt, and most recently his father, since he has been in solitary confinement, has further strained his stability.

113. Mr. Crispell spoke to his parents on the phone every couple of weeks and received one or two visits per year from his parents. Mr. Crispell now speaks with his mother every two or three weeks and hasn't had a visit from his family since his father's death.

114. It is discouraging and disheartening for his family to make such a long trip to see him behind glass, without any physical contact.

115. There are approximately thirty to forty inmates at SCI Greene who are of Native American decent or who practice Native American Spirituality, including Mr. Crispell. Mr. Crispell cannot attend Native American religious services

because he is on death row. A Native American Chaplain comes to his cell on a monthly basis to ask about his religious needs but Mr. Crispell has no community with other Native American people and cannot practice his beliefs properly or adequately in solitary confinement. There have been many times over the last 27 years that there hasn't been a Native American Chaplain for Mr. Crispell to talk to. Those time periods without a chaplain of his faith have lasted not weeks, or even months, but years at a time. During those times Mr. Crispell has no access to Native American religious guidance or instruction.

116. Telephone calls are placed via a rolling phone brought to Mr. Crispell's cell door, limited to three times per week, no longer than fifteen minutes each. Personal visits for RHU inmates are limited to one per week, although after 27 years of non-contact visits, Mr. Crispell's visitors have dwindled to two or three per year. The majority of those visits, are legal visits.

117. With each passing year, Mr. Crispell's isolated confinement has exacerbated his feelings of anxiety, frustration, difficulty concentrating, memory loss, and depression.

118. Mr. Crispell's anxiety has worsened over the course of his time in solitary confinement. Over the last twenty years Mr. Crispell's panic attacks have increased from once or twice a week, to having them multiple times per day, every day. The severity of Mr. Crispell's panic attacks have also increased dramaticly.

119. Over the course of the last 27years, Mr. Crispell's increasing anxiety has caused his sleep problems to intensify, driving him to seek help from the medical and psychiatric departments at SCI Greene. Mr. Crispell was told by the medical department that they couldn't help him because his problems were not a medical issue but a psychiatric issue. When Mr. Crispell sought help from the

psychiatric department, after numerous requests, he was seen by a prison psychiatrist who prescribed medication to help him sleep. The prison psychiatrist assigned to him changed on an almost monthly basis and the medications and dosages were changed often as well, some of those medications didn't help Mr. Crispell at all and some helped with his sleep problems, but had side effects that were worse physically than the lack of sleep for him. After a particularly bad reaction to one medication, Mr. Crispell was told by the psychiatrist assigned to him at the time, that there wasn't anything else Mr. Crispell could be given to help with his sleep problems, after which Mr. Crispell wasn't seen again by the prison psychiatrists until recently when he was brought back to solitary confinement on death row, after a brief time, five months, spent in general population.

120. Mr. Crispell has concentration and memory problems. If he doesn't focus his concentration on what he is doing at the moment, his mind wanders, and he loses track of time and what he was doing.

121. Over the years Mr. Crispell's memory has progressively gotten worse, his short-term memory is particularly bad. Mr. Crispell's short-term memory is so bad that he is constantly having to write things down that he has to do, but then forgets where he put his list of things to do. At times, Mr. Crispell will get up off of his stool or bed, and in the time it takes him to walk the two or three steps to the middle of his cell, he has forgotten why he got up in the first place. Sometimes the reason comes back to him, and sometimes it never does.

122. Mr. Crispell experiences on-going and ever-increasing depression each day that he remains in solitary confinement. His depression makes it difficult for him to even get out of bed some days.

123. The depression that Mr. Crispell experiences makes it difficult for him to do basic tasks such as concentrating, sleeping, exercising, writing letters,

or even just getting out of bed in the morning. He spends most of his days just sitting or laying in his bed.

124. Mr. Crispell's sleep patterns are sporadic at best. He averages three to four hours of sleep per night and even that is broken up into periods of 30 to 60 minutes at a time. It takes Mr. Crispell about a half hour to forty-five minutes to get to sleep, so every time that he wakes up the pattern starts all over again. On an average night Mr. Crispell tosses and turns throughout the entire night, roughly changing sleep positions every ten to fifteen minutes causing Mr. Crispell back and neck pain as well as constant headaches. Almost every day, Mr. Crispell spends dealing with tiredness and lack of energy as well as his neck and back pain. The thin plastic covered mattress and steel bed only exacerbate his sleep issues.

125. As a result of Mr. Crispell's extended isolation, he has increased difficulty concentrating; he has difficulty thought or focus on a suject. He easily loses his train of thought and his mind wanders often.This problem has gotten progressively worse each year as his perpetual solitary confinement has continued.

126. Mr. Crispell has sustained damage to his short-term memory capacity. He struggles to remember things that happened just minutes or hours before. If he doesn't consciously concentrate on retaining the memory it quickly fades away, leaving him confused and angry.

127. Depression, anxiety, asocial feelings, cognitive impairment, memory loss, and concentration difficulties are well-established adverse reactions to prolonged solitary confinement. Neuroscience has also established that prolonged isolation damages brain function and physically diminishes parts of the brain.

128. By continuing to hold Mr. Crispell in solitary confinement, Defendants are substantially increasing the actual harm to Mr. Crispell with each passing

day. The psychologically devastating conditions imposed on Mr. Crispell will continue to exacerbate the rapid deterioration of his mental health. Even if Mr. Crispell is released from solitary confinement, he will likely struggle with depression for the rest of his life.

129. The DOC policy imposing mandatory solitary confinement on inmates sentenced to death has existed since 1982, and Mr. Crispell has formed the belief that he will die on death row if he doesn't leave solitary confinement. Witnessing others die in solitary confinement has only increased his belief that this will also happen to him. He is terrified that he will be accidentally executed because he is still housed on death row.

130. Despite the obvious and thoroughly documented risks and harms that result from long-term solitary confinement, mental health staff at SCI Greene have never clinically examined Mr. Crispell or questioned him, regarding the psychological, emotional, or cognitive impact that his long-term solitary confinement has had and continues to have on him.

131. Solitary confinement of such a prolonged duration also places Mr. Crispell at risk of substantial harm to his already compromised physical health due to the extraordinary restrictions on his mobility and his ability to exercise, the effect that his solitary-induced depression has on his motivation and his ability to sleep, and the extreme stress placed on him by his conditions of confinement.

132. The gravity of his loss of focus and deteriorating emotional capacity is exacerbated by the need to provide effective assistance to counsel during his appeals.

133. Mr. Crispell's emotional deterioration is also exacerbated by the DOC's recent back and forth and seemingly arbitrary actions with Mr. Crispell's custody status and housing. No one seems to be able to give him straight answer as to why

they are doing to him what they are. These mind games are taking a heavy toll on Mr. Crispell's emotional and psychological stability.

134. Over the 17 months that have passed since *Williams* was decided, the DOC has given Mr. Crispell so many differing and conflicting answers to his questions about being housed in general population because of his vacated sentence, that it is impossible for him to understand what is happening to him and why.

135. In the past 17 months:

* Mr.Crispell was first told that the *Williams* decision didn't effect his housing status.

* Then within a couple of weeks, the DOC's answer changed to "yes", it would effect Mr. Crispell's housing, but Central Office was still working on the details.

* Then after Mr. Crispell filed a grievance on the matter, he was told that only a few death row inmates would be effected by the *Williams* decision, and he wasn't one of them.

* A week later he was told by prison staff that he was eighth on their list of inmates to be moved to general population, and to just be patient.

* A week or two later his grievance was denied because DOC policy hasn't changed.

* While waiting for the Superintendent's answer to his grievance appeal, Mr. Crispell was taken from his cell to meet with the PRC, where he was told that he was being released to general population because his death sentence had been vacated. When Mr. Crispell told them that he had been telling the prison that for months, Deputy Zaken replied, that Central Office had just sent the order to release him to general population.

* The next day Mr. Crispell was released to general population.

* Less than a week later, Mr. Crispell received Superintendent Gilmore's answer to his grievance appeal, denying it and upholding the grievance officer's response, even though by that time Mr. Crispell had already been released to general population, which was what his grievance was about.

* Then Mr. Crispell received his new sentence status summary, which said that he was on detainer for his murder conviction, but was now doing time on the other convictions in his case. His new minimum/ maximum was $28\frac{1}{2}$ to 57 years.

\* Five months later, without any warning, Mr. Crispell was yanked from general population and housed back on death row. He was told by prison staff that he never should have been released to general population in the first place because he still had an active death sentence.

136. All of these changing and conficting answers leave Mr. Crispell even more confused, anxious, depressed and angry then he already was. The psychological and emotional roller coaster Mr. Crispell has been forced to endure has been devastating to his state of mind and his ability to cope with his confinement.

D. Background of the Criminal Litigation

137. All other allegations and facts contained in this petition and its attachments are incorporated as if fully set forth herein.

138. On August 23, 1990, Mr. Crispell was sentenced to death after trial and conviction in the 1989 death of Mrs. Ella Brown, See Commonwealth v. Crispell, 530 PA. 234 (Pa. 1992).

139. On January 6, 2016, the Court of Common Pleas of Clearfield County (the Honorable John B. Leete, Senior Judge, Specially Presiding) granted Mr. Crispell's PCRA petition for habeas corpus relief in part, vacating the death sentence, and remanded the matter for a new penalty phase hearing, No. 90-62-CRA,. The Commonwealth appealed and Mr. Crispell cross-appealed.

140. In its notice of appeal/cross-appeal the Commonwealth expressed no position regarding where the DOC should house Mr. Crispell during the pendency of the appeal/cross-appeal.

141. On Februry 9, 2017, the Third Circuit issued its opinion in Williams v. Secretary, PA Department of Corrections, et al., 848 F.3d 549 (3d Cir. 2017), holding that due processlimits the DOC's ability to house inmates on death row without meaningful review of placement once they have been granted relief.

142. On February 21, 2018, the District Court issued its opinion in

28

*Hall v. Wetzel*, NO. 17-CV-4738, granting plaintiff's Motion for Preliminary Injunction, and ENJOINED the DOC from continuing to house Mr. Hall in the solitary conditions of confinement in the Capital Case/Restricted Housing Unit for the sole reason that he faced a capital sentence and/or pursuant to the provisions of 61 Pa. C.S.A. §4303 and any and all implementing regulations.

    E.   Roles of the Defendants in Continuing Mr. Crispell's Perpetual Solitary Confinement

    144. All other allegations and facts contained in this petition and its attachments are incorporated as if fully set forth herein.

    145. Defendants are aware of the harms and risks caused by long-term solitary confinement.

    146. More than 27 years of being forced to live in a very small concrete and steel area in conditions of extreme isolation, results in physical and psychological harm that are obvious to any person, including the Defendants.

    147. Defendants are aware that Mr. Crispell is being deprived of his basic human needs for mental and physical health, environmental stimulation, social interaction, exercise, sleep, and dignity on account of his long-term solitary confinement.

    148. Defendants have articulated no valid basis for Mr. Crispell's solitary confinement.

    149. Defendants are aware that there is no valid basis for Mr. Crispell's solitary confinement.

    150. Even if the reasons for which the DOC assigned Mr. Crispell to solitary confinement in 1990 were valid,(they were not), those reasons ceased to exist on January 6, 2016, when the Court of Common Pleas of Clearfield County vacated Mr. Crispell's sentence. The reasoning that Mr. Crispell poses "an unusual escape risk" ended when he received habeas relief vacating his sentence. He has

everything to gain from continuing his decades-long record of model behavior, as opposed to being an extraordinary safety threat who may "repeat his behavior while incarcerated". The fact that Mr. Crispell spent five months living in general population without any disciplinary or security problems whatsoever, not only proves the falseness of the DOC's claim but shows the arbitrariness of this DOC policy and their actions based on it.

151. Defendant Wetzel is the Secretary of the DOC, its highest-ranking DOC official. As such he is the only official with the authority to remove Mr. Crispell from the RHU and authorize his release into the general prison population.

152. Defendant Wetzel has made numerous decisions to retain Mr. Crispell in solitary confinement.

153. Defendant Wetzel is aware of the risks and harms associated with long-term solitary confinement. These risks and harms are known and understood by prison officials.

154. Defendant Wetzel has not taken any measures to release Mr. Crispell from solitary confinement.

155. Defendant Wetzel has not informed Mr. Crispell what he must do in order to be released from solitary confinement.

156. Defendant Wetzel has made no effort to seek input from Mr. Crispell, qualified medical professionals, or any other party regarding his solitary confinement.

157. Defenant Moore-Smeal is the Executive Deputy Secretary of the DOC. She makes a recommendation as to whether Mr. Crispell should be released to the general population or remain in solitary confinement.

158. Defendant Moore-Smeal is aware of the risks and harms associated with long-term solitary confinement. These risks and harms are known and understood by

prison officials.

159. According to the DOC website, in November 2016, Defendant Moore-Smeal co-led a training session for the National Institute of Corrections' conference, "Restrictive Housing: Roadmap to Reform". *See* http://www.cor.pa.gov/General%20 Information/Pages/Administrative-Segregation-and-Violence-Reduction-Initiative .aspx#.WUq6mufD-70. The news release states that the DOC has developed different units "to address inmates with diverse needs," including "those transitioning from restrictive housing to the general population." *Id* Defendant Moore-Smeal specifically claims the DOC is "humanizing the system...We need to look at each person as an individual and what is best for that individual." *Id.*

160. Defendant Moore-Smeal has not taken any measures to release Mr. Crispell from solitary confinement, or to recommend his release to the general population.

161. Defendant Moore-Smeal has not informed Mr. Crispell as to the basis for his continuing solitary confinement, nor of the basis for her own recommendations.

162. Defendant Moore-Smeal has not informed Mr. Crispell what he must do in order to be released from solitary confinement.

163. Defendant Moore-Smeal has made no effort to seek input from Mr. Crispell, qualified medical professionals, or any other qualified person regarding his solitary confinement.

164. Defendant Wingard is the Regional Deputy Secretary of the DOC for the Western Region. He makes a recommendation as to whether Mr. Crispell should be released to the general population or remain in solitary confinement.

165. Defendant Wingard is aware of the risks and harms associated with long-term solitary confinement. These risks and harms are known and understood by prison officials.

31

166. Defendant Wingard has not taken any measures to release Mr. Crispell from solitary confinement, or to recommend his release to general population.

167. Defendant Wingard has not informed Mr. Crispell as to the basis for his continuing solitary confinement, nor the basis for his own recommendations.

168. Defendant Wingard has not informed Mr. Crispell what he must do in order to be released from solitary confinement.

169. Defendant Wingard has made no effort to seek input from Mr. Crispell, qualified medical professionals,or any other qualified person regarding his solitary confinement.

170. Defendant Gilmore is the Superintendent of SCI Greene. He makes a recommendation as to whether Mr. Crispell should be released to the general population or remain in solitary confinement. He is also responsible for the operation of SCI Greene.

171. Defendant Gilmore is aware of the risks and harms associated with long-term solitary confinement. These risks and harms are known and understood by prison officials.

172. Defendant Gilmore has not taken any measures to release Mr. Crispell from solitary confinement, or to recommend his release to general population.

173. Defendant Gilmore has not informed Mr. Crispell as to the basis for his continuing solitary confinement, nor of the basis for his own recommendations, other then to state that it is DOC Policy.

174. Defendant Gilmore has not informed Mr. Crispell what he must do in order to be released from solitary confinement.

175. Defendant Gilmore has made no effort to seek input from Mr. Crispell, qualified medical professionals, or any other qualified person regarding his solitary confinement.

176. Defendant Gilmore has never spoken with Mr. Crispell and the majority

of requests that Mr. Crispell has sent him have either been answered by one of his assistants or not at all.

177. Defendant Zaken is the Deputy Superintendent for Facilities Management at SCI Greene. He makes a recommendation as to whether Mr. Crispell should be released to the general population or remain in solitary confinement.

178. Defendant Zaken was also a member of the Program Review Committee.

179. Defendant Zaken was aware of the risks and harms associated with long-term solitary confinement. These risks and harms are known and understood by prison officials.

180. Defendant Zaken did not take any measures to release Mr. Crispell from solitary confinement, or to recommend his release to general population.

181. Defendant Zaken did not inform Mr. Crispell as to the basis for his continuing solitary confinement, nor of the basis for his own recommendations, other than to state it is DOC Policy.

182. Defendant Zaken did not inform Mr. Crispell what he must do in order to be released from solitary confinement.

183. Defendant Zaken made no effort to seek input from Mr. Crispell, qualified medical professionals, or any other qualified person regarding his solitary confinement.

183. On those occasions that Defendant Zaken did speak with Mr. Crispell, he was abrupt and dismissive of his requests to be released from solitary confinement, refusing to discuss the matter other than to say its up to Central Office, there was nothing he could do.

F.    Exhaustion of Administrative Remedies

184. All other allegations and facts contained in this conplaint and its attachments are incorporated as if fully set forth herein.

185. Under the DOC's Administrative Custody policy DC-802, "[a]ll issues

concerning an inmate's placement in AC custody or the duration, condition or other circumstances of his/her AC custody must be addressed through the procedures set forth in Department policy DC-ADM 801, 'Inmate Discipline' or DC-ADM 804, 'Inmate Grievance System.' The DC-802 further provides that all issues must be addressed at PRC hearings, and that appeals regarding these issues must be filed to the Superintendent within two days after the hearing. Once the Superintendent replies, a prisoner must appeal to Central Office if he or she is dissatisfied with the response.

186. Capital case prisoners are held pursuant to the DC-802 Administrative Custody policy and are considered Administrative Custody RHU prisoners.

187. On February 17, 2017, Mr. Crispell was seen by the PRC for his 90 day review, where Mr. Crispell asked to be released to general population because his death sentence had been vacated on January 6, 2016, and provided the PRC with a copy of the court order vacating his sentence. (Attached-Exhibit A). The PRC denied Mr. Crispell's request. (Attached-Exhibit B). On February 22, 2017, Mr. Crispell filed an "Official Inmate Grievance" (#665895), reminding the DOC that he requested to be moved from the RHU several times and now made such request under authority of *Williams*.(Attached-Exhibit C). In early March, Mr. Crispell received a "Notice of Staff Extention" for 10 days, dated March 3, 2017. (Attached-Exhibit D). March 20, 2017, his grievance (#665895), was denied. (Attached-Exhibit E). On March 26, 2017, Mr. Crispell filed an appeal of his grievance (#665895), denial to Superintendent Gilmore. (Attached-Exhibit F). On April 21, 2017, his grievance was remanded back to the grievance officer for a revised response. (Attached-Exhibit G). On April 26, 2017, his grievance (#665895) was once again denied. (Attached-Exhibit H). On April 28, 2017, Mr. Crispell filed his second appeal to Superintendent Gilmore for grievance (#665895), for its second denial. (Attached-Exhibit I). On May 18, 2017, Mr.

Crispell met with the PRC for his 90 day review, where he once again asked to be moved to general population. He was denied. (Attached-Exhibit J). SCI Greene Superintendent Gilmore, denied his second grievance appeal on June 7, 2017, 5 days after Mr. Crispell was already in general population. (Attached-Exhibit K). Mr. Crispell didn't pursue his grievance (#665895) further since he had already been released to general population.

188. On November 8, 2017, Mr. Crispell was moved back to death row.

189. On November 14, 2017, Mr. Crispell met with the PRC and asked to be moved back to general population, he was denied. (Attached-Exhibit L).

190. On November 15, 2017, Mr. Crispell filed an appeal of the outcome of his November 14, 2017, PRC hearing to Superintendent Gilmore. (Attached-Exhibit M).

191. On November 19, 2017, Mr. Crispell filed an "Official Inmate Grievance" (#707786), on the matter. (Attached-Exhibit N).

192. On December 20, 2017, Mr. Crispell received the "Initial Review Response" to his grievance (#707786), denying his grievance. (Attached-Exhibit O).

193. On December 22, 2017, Mr. Crispell recieved Superintendent Gilmore's denial of his PRC Review Appeal, dated December 12, 2017. (Attached-Exhibit P).

194. On December 26, 2017, Mr. Crispell filed his grievance (#707786) appeal to SCI Greene Superintendent Gilmore. (Attached-Exhibit Q).

195. On December 26, 2017, Mr. Crispell filed his "Final Appeal" of the outcome of his November 14, 2017, PRC Review to the Chief Hearing Examiner, Central Office, Department of Corrections, 1920 Technology Parkway, Mechanicsburg, PA 17050. (Attached-Exhibit R). Mr. Crispell has never received a response to his Final PRC Review Appeal.

196. On January 29, 2018, Mr. Crispell received, SCI Greene Superintendent

Gilmore's denial of his grievance (#707786) appeal, dated January 22, 2018. (Attached-Exhibit S).

197. On January 30, 2018, Mr. Crispell filed his "Inmate Appeal to Final Review" for his grievance (#707786) to the, Secretary's Office of Inmate Grievances & Appeals, Pennsylvania Department of Corrections, 1920 Technology Parkway, Mechanicsburg, PA 17050. (Attached-Exhibit T).

198. On March 16, 2018, Mr. Crispell received a "Grievance Referral" (Notice to Inmate) for his grievance (#707786), from Chief Grievance Officer, Dorina Varner, Secretary's Office of Inmate Grievances & Appeals, 1920 Technology Parkway, Mechanicsburg, PA 17050. (Attached-Exhibit U). The Notice stated that his grievance was being referred to another department to solicit input.

199. On April 25, 2018, Mr. Crispell sent a letter to Dorina Varner: Chief Grievance Officer, PA Department of Corrections, 1920 Technology Parkway, Mechanicsburg, PA 17050, asking her to send him the Final Review Decision on his grievance (#707786), as it was long overdue according to DOC policy. (Attached-Exhibit V).

200. On May 16, 2018, Mr. Crispell received his "Final Appeal Decision", denying his Final Appeal of grievance (#707786) dated May 9, 2018, and signed by, Chief Grievance Officer, Dorina Varner, Secretary's Office of Grievances & Appeals, 1920 Technology Parkway, Mechanicsburg, PA 17050. (Attached-Exhibit W),

201. As of the date of this Complaint, Mr. Crispell remains in solitary confinement in the RHU, having been informed that he will not be moved to general population because his habeas relief had been stayed by a pending appeal to the Supreme Court of Pennsylvania, No. 722 CAP, by the Commonwealth, so he still had an "active" death sentence.

202. For the foregoing reasons, Mr. Crispell has satisfied the requirement that he exhaust all available administrative remedies.

CAUSES OF ACTION

COUNT I.  ALL DEFENDANTS: THE FAILURE TO REMOVE MR. CRISPELL FROM PERPETUAL SOLITARY CONFINEMENT VIOLATES THE EIGHTH AMENDMENT.

203. All other allegations and facts contained in this complaint and its attachments are incorporated as if fully set forth herein.

204. Each Defendant, individually and collectively, has violated Mr. Crispell's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution to be free from cruel and unusual punishment by acts and omissions manifesting a deliberate indifference to the deprivation of Mr. Crispell's basic human needs for physical health, mental health, environmental stimulation, social interaction, exercise, sleep, and basic human dignity.

205. All Defendants have violated Mr. Crispell's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution to be free from cruel and unusual punishment by keeping Mr. Crispell in conditions of solitary confinement that cause severe pain without penological purpose, and which are grossly disproportionate to any purported governmental interests.

206. All Defendants have violated Mr. Crispell's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution to be free from cruel and unusual punishment by keeping Mr. Crispell in solitary confinement for an extended and unlimited period, and such confinement has caused, and continues to cause, substantial physical and psychological harm to him.

COUNT II.  ALL DEFENDANTS: SUBJECTING MR. CRISPELL TO PERPETUAL SOLITARY CONFINEMENT VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

207. All other allegations and facts contained in this complaint and its

attachments are incorporated as if fully set forth herein.

208. All Defendants have violated Mr. Crispell's rights under the due process clause of the Fourteenth Amendment to the U.S. Constitution including, without limitation, by engaging in the following conduct: failing to provide Mr. Crispell with a meaningful opportunity to challenge his solitary confinement, including providing him information regarding the basis for any decisions regarding the continuation of his solitary confinement; failing to provide Mr. Crispell a meaningful opportunity to be heard in order to challenge his continuing solitary confinement; denying Mr. Crispell any opportunity to provide information to and/or to influence the ultimate decision-maker regarding his continuing solitary confinement; and informing Mr. Crispell what is required of him in order for him to be released from solitary confinement.

COUNT III.    ALL DEFENDANTS: SUSTANTIVE DUE PROCESS VIOLATION

209. All other allegations and facts contained in this petition and its attachments are incorporated as if fully set forth herein.

210. All Defendants have violated Mr. Crispell's right to substantive due process under the Fourteenth Amendment to the U.S. Constitution by continuing to hold him in solitary confinement for nearly 28 years without a valid penological or other justification. Defendants' conduct shocks the conscience and does not have a rational basis.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

(1)    Declare Defendants' conduct unlawful;

(2)    Enjoin and restrain Defendants from incarcerating Mr. Crispell in solitary confinement or other similar conditions and order Mr. Crispell's placement in the general population;

(3)    Mandate that Defendants provide Mr. Crispell with proper psychological and mental health services made necessary due to his prolonged solitary confinement;

(4)    Award compensatory and punitive damages;

(5)    Grant attorneys' fees and cost; and

(6)    Such other relief as the Court deems just and proper.

Dated: August  6 , 2018

Respectfully submitted,

*Daniel L. Crispell*

Daniel L. Crispell
#BH-8972
SCI Greene
175 Progress Drive
Waynesburg, PA 15370

## VERIFICATION STATEMENT

I, <u>DANIEL L. CRISPELL</u>, Plaintiff, have read and hereby verify that all matters mentioned, depicted, and referenced to in this COMPLAINT, are true and correct to the best of my Knowledge, Information and Belief, pursuant to 18 Pa. C.S.A. § 4904.

DATED: August <u>  6  </u>, 2018

*Daniel L. Crispell*

DANIEL L. CRISPELL
#BH-8972
SCI GREENE
175 PROGRESS DRIVE
WAYNESBURG, PA 15370